THE GREAT ATLANTIC &
PACIFIC TEA COMPANY, Inc.,
Plaintiff
vs.
Robert K. GEORGE, Donald W.
GEORGE, and BERKSHIRE COUNTY
SAVINGS BANK, Defendants

No. 98420

Land Court Department
Trial Court of the
Commonwealth of Massachusetts
March 5, 1982

Daniel S. Sacco, counsel for plaintiff.
Allen S. Goldberg, counsel for plaintiff.
L. George Rider, counsel for Berkshire
City Savings Bank.
Michael J. Shepherd, counsel for
George.

## DECISION

In this complaint by the Great Atlantic
& Pacific Tea Company, Inc. ("A & P"),
the plaintiff, for a determination as to the
date of expiration fo the extended term of

a certain lease of premises in Pittsfield, in the County of Berkshire, I hold the date to be September 30, 1985. Count II of said complaint seeks treble damages pursuant to G.L.c. 93A, § 11 on account of willful and knowing unfair and deceptive acts and practices allegedly engaged in by the defendants, Robert K. George and Donald W. George. I hold that this Court is without jurisdiction to decide causes of action rooted in Chapter 93A, and that it is not possible now to transfer Count II to the Superior Court for determination as requested by the plaintiff in its brief.

A trial was held at the Land Court on November 12, 1981 at which a stenographer was appointed to record and transcribe the testimony. All exhibits introduced into evidence are incorporated herein for the purposes of any appeal. Two witnesses testified for the plaintiff and Mr. Robert K. George testified for himself and his co-defendants.

On all the evidence, I find and rule as follows:

1. Richard Stiegler, the then owner of a parcel of registered land at the corner of Elm Street and Root Place in said Pittsfield, demised it to A & P by lease dated November, 1959 (the "Lease") (Exhibit No. 1). A second copy of the lease without the cover sheet is Exhibit No. 2. A copy of the cover sheet is Exhibit No. 30. A & P was already in possession of a store building on the leased premises which was to be enlarged and remodeled to its specifications.

2. The stated term of the Lease was June 1, 1960 to May 31, 1970 with provisions for earlier or later commencement of the term dependent upon completion of the improvements. In fact, the premises were accepted by the Lessee on September 20, 1960 (Exhibit No. 19) and the parties thereto treated the term of the Lease as commencing on October 1, 1960 in accordance with the provisions of the lease.

3. The Lease also contained a provision that "[t]he Lessee, at its option shall be entitled to the privilege of three successive extensions of this lease, each such

extension to be for a period of five years...'"

4. The Lease further provided for an automatic extension of the term for all but the expiration of the last extension if the lessee remained in possession. Paragraph 23 provided:

"23. The Lessee, by continuing to occupy the leased premises after the expiration of the original term of its tenancy hereunder, or after the expiration of any extension thereof, except the last of said periods, shall be deemed and considered to have elected to avail itself of its then current right to extend this lease, subject to all the terms and conditions herein contained, unless it shall have clearly and unequivocally manifested a contrary intention, and it shall not be obliged to give any other notice of its said election."

5. A notice of lease was registered with the Berkshire (Middle District) Registry of the Land Court as document No. 10196 on March 28, 1960 and noted on Certificate of Title No. 2442. The notice of lease set forth both the date of the original term and the existance of three renewal privileges of five years each.

6. The original lessor, Richard Stiegler, died at some time during the original term of the Lease. A & P, therefore, wrote to his widow, Mary Lee Stiegler, under date of September 11, 1970, to exercise its option to extend for five years beginning October 1, 1970.

7. Rather than exercising its second five-year option to extend, A & P, apparently having entered a period of retrenchment, negotiated an agreement with Mrs. Stiegler, whereby the second option period was revised. The instrument of August 11, 1975 (Exhibit No. 6) provides for a one-year renewal from October 1, 1975 to September 30, 1976 with the privilege of further "renewals": two succesive one-year options, one two-year option and the concluding five-year option. The agreement further provided for exercise of each option three months in

advance and concluded "[t]he renewal privileges granted above supersede and cancel all previous renewal privileges heretofore granted under this lease." The August 11, 1975 agreement had no acknowledgment and was not registered. The five-year option set forth referred to therein was a duplicate of the third five-year option set forth in the Lease.

8. There is no evidence as to who made the changes in the cover sheet of the Lease changing the reference to "three" five-year options thereon to "two" which literally was correct if the middle five-year option were viewed as three shorter options. Neither is there any evidence as to when the handwritten changes were made. In any event, the summary of the provisions of the Lease on the cover sheet cannot control those in the instrument itself.

9. In 1977 the defendants George approached John Stout of Stout & Company, agent for Mrs. Stiegler, and a witness at the trial, relative to an option to purchase the premises. The father of the defendants, Samuel B. George, for many years has been extensively involved in real estate transactions and holdings, and his sons learned the business at his knee. Robert K. George, a witness at the trial as noted above, also is a licensed real estate broker and a Lenox restauranteur. The defendants also own a liquor store adjacent to the leased premises. Samuel, Robert and Donald George met with Mr. Stout on at least one occasion concerning a possible purchase. The meeting may have begun in the liquor store and moved to the parking lot of the supermarket or originated in the lot. Mr. Stout was unable to state unequivocably that he had delivered a copy of the August 11, 1975 agreement to the defendants either at the meeting at the locus or at the closing. He did testify, however, that he always kept the legal documents on the left side of his folder, which is now empty. This part of the file previously consisted of the Lease, any amendments and any additions or extensions. The documents which he had in his file, were given to the attorneys at the

closing, he did have Exhibit No. 6 in his file, and he no longer has any documents relative to the Lease.

10. Although Mr. Stout did not remember whether Exhibit No. 6 had been given to the defendants at their initial meeting, he testified that he explained the terms contained in Exhibit No. 6, the August 11, 1975 agreement. In response to a question from the Georges as to why Mr. Stout had done this, he replied that in 1975 A & P had a retrenchment, had closed some stores and had broken down their options into shorter periods in order to give more flexibility to its future plans. His honest answer to a question as to whether A & P would exercise its future options was that he did not think so.

11. Robert K. George in his testimony, denied that he had seen Exhibit No. 6 at or prior to the closing and stated that he had not been told the contents of Exhibit No. 6, that he had seen the cover sheet (Exhibit No. 30) of the Lease on which the reference to three five-year extensions had been changed to two, that the copy of the Lease was illegible and that it was not until March of 1978 that he received the Lease and Lease Renewal. This testimony is contradicted by the response of each defendant George to Question 37 of the Plaintiff's first set of Request for Admissions. Each replied, "I had read a copy of the A & P Lease prior to the purchase of the A & P premises." (Exhibits Nos. 21 and 22).

12. After the spring of 1977 meeting, the Georges and Mr. Stout communicated by telephone, and under date of July 12, 1977 Mrs. Stiegler executed a one-year option to purchase the premises for $250,000 (Exhibit No. 32). Subsequently, a purchase and sale agreement was executed between Mrs. Stiegler and Robert K. George dated October 14, 1977, covering the premises and providing for a purchase price of Two Hundred Twenty-five Thousand Dollars ($225,000) (Exhibit No. 33). The option agreement provided that title was to be "free and clear of all liens, encumbrances and other defects in title, but subject to a

certain lease to The Great Atlantic & Pacific Tea Company as it now exists **including presently existing extensions thereof.**" (underlining added). Paragraph 5 of the option also refers to the lease in connection with delivery of possession. The option appears to have been recorded but not registered. The purchase and sale agreement provides for title subject to Existing Lease to Great Atlantic & Pacific Tea Company and possession "subject to tenancy of A & P SUPER MARKET."

13. At the closing the warranty deed (Exhibit No. 11) which was delivered had stricken therefrom the language which appeared in the agreement as to encumbrances. However, there also was delivered an Assignment of Lease (Exhibit No. 12) in which reference is made to the Notice of Lease and in which Mrs. Stiegler as assignor represents that the Lease is in full force and effect according to its tenor. The deed was registered as document No. 16141 and the Assignment of Lease as document No. 16143 with said Registry District on November 29, 1977. Certificate of Title No. 4988 (Exhibit No. 13), therefore, was issued to the defendants George covering the premises. Noted thereon is the Lease, the Mortgage to the defendant Bank[1], and the Assignment of Lease.

14. At the trial, counsel for the defendants George stipulated that in examining the records, it found the Notice of Lease and was aware of its provisions.

15. After the Georges purchased the premises, discussions were had with representatives of A & P as to changes in the type of market on the premises, but in the end no changes were made.

16. By letter to the Georges dated May 11, 1978, A & P exercised its option to extend the term of the Lease for two years commencing October 1, 1978 and ending September 30, 1980.

17. Similarly by letter to the Georges dated June 26, 1980 A & P exercised or attempted to exercise the option to extend the term of the Lease for five years commencing October 1, 1980 and ending September 30, 1985. The parties have stipulated[2] that the August 11, 1975 agreement exists and that letters dated June 25, 1976, June 10, 1977, May 11, 1978 and June 26, 1980 were sent by A & P and received before July 1 of the year in which each such letter was sent by the then owner of the premises. By such letters, A & P attempted to extend the term of the lease.

18. The Lease provides for the lessee to pay **annually** in one payment any increase in the real estate taxes up to a maximum of $5,000 in any one year. Beginning in December of 1978, counsel for the Georges wrote several letters to A & P relative to its failure to make the tax payments including statutory notices to quit and deliver up the premises for non-payment of rent. (Exhibits Nos. 14, 18, 25, 26 and 28). A & P did pay $7,500 in May of 1979 covering its share of real estate taxes for the period from January 1, 1978 to June 30, 1979. Agreement apparently has been made (Exhibit No. 23) for A & P to continue to make such payments during the pendency of this litigation.

19. By letter dated February 27, 1980, a notice of the intention of the landlords to terminate the A & P tenancy as of April 1, 1980 was given (Exhibit No. 15). No reason for the termination is given in the notice, and it appears to be a belated attempt to treat A & P's occupancy as a tenancy at will.

---

1. The Bank did not appear at the trial, and counsel for A & P moved to default it. The Court took the motion under advisement and now denies it. In its answer, the Bank as its first defense alleged that it is neither a party to the Lease nor has it taken any action to evict the plaintiff. It also has taken no position as to the enforceability of the extension of the term of the Lease. As holder of the first mortgage on the premises, it was a necessary party, but apparently a neutral one.

2. By the stipulation, the defendants George expressly did not waive their contention that the August 11, 1975 amendment and the letters sent pursuant to it have no force as to them.

When the Lease was executed in 1959, General Laws, Chapter 183, Section 4 provides that "...a lease for more than seven years from the making thereof, shall not be valid as against any person, except - the lessor, unless it...or a notice of lease is recorded..."

> "A "notice of Lease", as used in this section, shall mean an instrument in writing executed by all persons who are parties to the lease of which notice is given and shall contain the following information with reference to such lease: —the date of execution thereof and a description, in the form contained in such lease, of the premises demised, and the term of such lease, with the date of commencement of such term and all rights of extension or renewal."

This provision was added to the recording statutes by St. 1941, c. 85. General Laws, Chapter 185, Section 71 applies to registered land, and reads "Leases, or notice of lease as defined in section four of chapter one hundred and eighty-three, of registered land for a term of seven years or more shall be registered, in lieu of recording." In accordance with the requirements of said sections 4 and 71, a notice of lease was registered after the Lease was executed. Careful conveyancing might have suggested that the notice be revised when the improvements were completed and the term of the lease in fact commenced. In the present case, however, nothing turns on this failure. The Notice of Lease, as registered, clearly set forth the lessee's right to extend for three successive periods of five years. Admittedly counsel for the defendants George knew of the terms of the notice of lease; in addition, the Georges admitted that they had read the Lease prior to the closing of the purchase of the premises. Accordingly, the Georges knew that A & P had the right, if its options had been, or were, ultimately exercised, to remain in possession until 1985. **Universal Container Corp. v. Cambridge**, 361 Mass. 58 (1972). Under the terms of the Lease,

nothing appeared on the record to suggest that the options had been revised, and the presence of A & P in possession after the expiration of the term strongly suggested the exercise of two of the options. The Georges, therefore, had a duty at their peril to inquire of A & P as to the status of the extensions. See, **Mister Donut of America, Inc. v. Kemp**, 368 Mass. 220 (1975). **Ecclesiastes 3;1, Inc. v. Cambridge Savings Bank**, Mass. App. Ct. (1980).[3] This is particularly so here where the Georges as they now contend, were interested in acquiring possession of the premises in 1980, but options of record continued into 1985.

An inquiry from the Georges to A & P would have elicited information about the August 11, 1975 agreement. At the time of its execution, the recording statute set forth in part above had been amended by St. 1973, c. 205 to require, among other changes, the recording of the lease or notice of lease where the lease was "for a term of seven years"[4] a change from the previous language a lease "for more than seven years from the making thereof." The 1975 agreement was not registered. **Snyder v. Sperry & Hutchinson Company**, 368 Mass. 433 (1975) holds that an amendment to an existing lease or a renegotiation of an earlier lease, for a term of less than seven years from its making need not be recorded. The Court in **Sperry** did not decide the effect of the amended section 4 on the result reached under the earlier language although it noted the revision in language. Each of the parties here argued that this case is governed by **Sperry**. The 1975 agreement was intended, it seems clear, to rewrite the middle five-year option, so from this viewpoint possession was not kept by a tenant under an unrecorded lease for seven years; this was the rationale on which the **Sperry**

---

3. Mass. App. Ct. Adv. Sh. (1980) 1551, 1558.
4. The amendment did not include the words "at least" before "seven" or the words "or longer" after "years", but that is its clear import.

Court rested. There seems no doubt that revising only the middle option was the intention of the parties, and accordingly, A & P's arguments should prevail, i.e. the August 11, 1975 agreement did not have to be registered to bind persons without actual notice. However, the agreement also incorporated as a part thereof the final five-year extension already set forth in the Lease and the registered notice of lease, so it technically can be read as giving A & P the right to a ten-year term. This is the argument made by the Georges.

I need not make a definitive finding on this point, however, for recording or registration becomes important only if the Georges were without actual notice of the 1975 agreement. **Killam v. March,** 316 Mass. 646 (1944) reviews at length the provisions of Chapter 185 relating to registered land and concludes that one purchasing registered land takes subject to an unregistered lease for more than seven years if he has actual notice of it. The same rule applies as to unregistered land; in each instance, it is not knowledge of sufficient facts to put a buyer on notice, but actual notice which is necessary to subject a buyer to the provisions of the instrument. See, **Toupin v. Peabody,** 162 Mass. 473 (1895). **South Street Inn, Inc. v. Muesham,** 323 Mass. 310 (1948). Robert K. George testified that he had not seen the 1975 agreement until March of 1978. This statement taken literally may be true. It is apparent to me, however, that he had actual knowledge of its terms prior to the execution of the option agreement. John Stout testified that he had explained the terms of the agreement to the Georges, Robert, Donald and Samuel, in the spring of 1977, and I so find. The conversation explored the likelihood of A & P exercising its option beyond 1980, and Mr. Stout was a poor prophet as to that. His testimony as to the delivery of the executed agreement at the closing, if not earlier, also has the ring of truth to it. Conversely, it is not credible that experienced businessmen would purchase the premises without exploring the lessee's option rights and satisfying themselves as to them. Mr. George testified that although they were not happy with the "numbers" (i.e., the rent), they could live with them until the 1980 termination. If they had not seen the 1975 agreement, there was nothing (other than Stout's prophecy) to suggest that A & P's rights terminated in 1980 except perhaps the marked up cover sheet. This simply is a case of the defendants' gambling that A & P would vacate the premises prior to 1985 and of losing. Even if the Georges believed the lease would end in 1980, I put no weight in the testimony at the trial that the Lease was not read prior to the closing. This testimony is contrary to the Responses and to any reasonable course of conduct. It casts doubt on the remainder of Mr. George's testimony as a witness.

There is nothing in **O'Brien v. Hurley,** 325 Mass. 249 (1950) which requires a different result. The defendants do not contend that the A & P presently is in default in its undertakings as set forth in the Lease. Even if A & P previously had been, **Howard D. Johnson Company v. Madigan,** 361 Mass. 454 (1972) suggests such defaults are not now of moment. The 1975 agreement of which I have found the Georges had actual notice set forth the dates by which A & P was required to give notice to exercise its successive rights to extend the term. While as hereinbefore noted, the date of commencement of the original term was four months later than comtemplated by the notice, the Lease made provisions for this, and the Georges were familiar with it. They also had the opportunity to see the precise language of Exhibit No. 6 at the closing so there is no reason not to hold them to the September 30 termination date.

A & P argues that this Court has jurisdiction to hear and determine complaints arising under G.L.c. 93A, § 11. It has called to the Court's attention the decision in **Little v. Rosenthal,** 376 Mass. 573 (1978) where the Supreme Judicial Court held that a medical malpractice tribunal had complete jurisdiction over

cases involving malpractice including those alleging unfair treatment in medical treatment (but excluding such areas as fraudulent or deceptive billing and the like). Apt though the analogy may be, the jurisdiction of this Court in the Consumer Protection field seems more akin to that of the Housing Court where it required a specific inclusion by the legislature in the language of G.L.c. 93A, § 11 to give it jurisdiction. Section 11 now refers to the Superior, District and Housing Court Departments, but is silent as to the Land Court. It seems to follow that the General Court did not intend that this Court have jurisdiction. **Chakrabarti v. Marco S. Marinello Associates, Inc.,** 377 Mass. 419 (1979) **Haas v. Breton,** 377 Mass. 591 (1979).

A & P has requested this Court in the event of a decision that the Land Court has no jurisdiction in Chapter 93A cases, to transfer the matter to the Superior Court Department for a determination of its Chapter 93A claim. A transfer from one department of the Trial Court to another cannot be done in a piecemeal fashion in the light of the determination by this Court of the major portion of the case. The time for a motion to remove was before, not after, the trial.

On all the evidence, I find and rule that the plaintiff duly registered a Notice of Lease with the Berkshire (Middle District) Registry of the Land Court as document No. 10196, that said Notice of Lease set forth the three options to extend for five years each, that the Lease provisions as to the options to extend were revised by agreement dated August 11, 1975, that said agreements, which was not registered, provided for three one-year extensions, one two-year extension and the remaining five-year extension set forth in the original Lease, that prior to the execution of the option agreement from Mary Louise Stiegler to the defendants George, the Georges were advised as to the terms of the August 11, 1975 agreement, that it was anticipated that the plaintiff would not exercise its last five-year extension, that at or prior to the closing of the purchase of the premises by the defendants George they or their attorneys received a copy of agreement, that in the face of the continued occupancy by A & P, the terms of the registered notice of lease and the business experience of the defendants, no explanation of the consummation of the purchase is credible other than actual knowledge by the defendants of the terms of the August 11, 1975 agreement, that the defendants never consulted A & P as to the Lease, the then existing provisions as to its right to extend or its plans relative to the premises, that the August 11, 1975 agreement also incorporated the October 1 commencement date for each term, that the present and last extended term expires September 30, 1985, that upon payment of the rent and additional rent and the performance of all convenants and conditions on its part to be performed, all as provided in the Lease, A & P is to have possession and quiet enjoyment of the demised premises and that this Court has no jurisdiction over proceedings arising under Chapter 93A of the General Laws.

The defendants George have filed Requests for Findings of Fact and Rulings of Law. Requests for Findings 1 and 7 are granted. Requests for Findings Nos. 2 and 4 are denied as the dates of registration therein are incorrect. Request for Finding No. 3 is denied as the Court has insufficient evidence upon which to rule. Request No. 5 is denied as the Court finds that Mr. Stout expressed such date as his opinion, not that he so advised the defendants George. Requests Nos. 6 and 9 are denied. Request No. 10 states the facts, but they are immaterial. As to the Requests for Rulings, I grant No. 1. Nos. 2 and 3 are dealt with in the decision, and Nos. 4, 5 and 6 are denied.

Judgment accordingly.

**Marilyn M. Sullivan, Justice**